JOYCE, Appellant, v. JOYCE et ux., Respondents. (Supreme Court, Appellate Division, Fourth Department. November 12, 1901.) Action by Luke H. Joyce against Henry D. Joyce and wife, commenced on the 22d day of September, 1900, to recover from the defendant Henry D. Joyce the sum of $1,000, with interest from April 4, 1900, and to have said sum declared a lien upon a certain house and lot situate in the city of Buffalo, N. Y., described in the complaint, the premises sold, and out of the proceeds that there be paid to the plaintiff said sum and the expenses of sale, together with the costs of this action; it being alleged that said sum was wrongfully obtained from the plaintiff by said defendant on or about said 4th day of April, 1900, and was expended in payment for said house and lot, which he purchased, the deed of which was taken in his name. The defendant by his answer admits receiving said sum of money from the plaintiff, and that he applied the same in payment of the purchase price of said premises, but denies that he obtained it wrongfully, and alleges that it was a gift to him by the plaintiff, who is his father, in consideration of love and affection, and that it became his money and property, and that he had the right to expend it in the purchase of said house and lot in the manner in which he did. The defendant Catherine Joyce is the wife of Henry D. Joyce, and is made a party defendant only for the purpose of foreclosing her dower right in the premises. The learned trial court found the facts substantially as alleged by the defendant, and the only question presented by this appeal of plaintiff is whether or not the proof justifies such decision. Arthur D. Hickman, for appellant. Adolph Rebadow, for respondents.

PER CURIAM. Judgment affirmed.

McLENNAN, J. (dissenting). At the time the transaction which is the subject of this controversy took place the plaintiff was 68 years of age. He had been a member of the police force of the city of Buffalo for 16 years, and until about 5 years before the time in question, when he was retired upon a pension of $33.33 a month on account of ill health, since which time he has not been engaged in any business or occupation. His entire property consisted of $2,000 in money, which was on deposit in the Erie County Savings Bank, and some vacant lots in the city of Buffalo worth comparatively little; their exact value not appearing. The plaintiff's wife had died several years before, and since his retirement from the police force he has lived with friends a considerable portion of the time, but made his home with his son, the defendant. and, while living with him, paid for his board the same as any other person would have done. The plaintiff also had two daughters,—one a Mrs. Hobern, who resided in Chicago, and a Mrs. Laughlin, who resided with a Catholic priest named Rengel, who was a personal friend and the spiritual adviser of the plaintiff. Immediately prior to the 21st of March, 1900, the plaintiff was residing with the defendants at the home of his son, and, so far as appears, their relations were most friendly and cor-

dial, as were also the relations between the plaintiff and his two daughters. A few days before the 21st of March, 1900, the plaintiff was taken seriously ill with a complication of diseases, which it is unnecessary to describe, of such a character that it was deemed best to remove him to one of the public hospitals of the city, and he was accordingly taken to such hospital on said 21st of March, 1900. He was attended by a physician, who pronounced his condition critical. Another physician was called in consultation. They both determined that the plaintiff could not live, and that in all probability his death would occur within a short space of time. The attendants at the hospital, Father Rengel, and the members of plaintiff's family, including the plaintiff's son, were informed of such conclusion by the physicians, and the last sacrament was administered by another priest procured by Father Rengel. After such sacrament had been administered, at least within a few days, while the plaintiff concededly was in a very critical condition, Father Rengel called and suggested that the plaintiff might dispose of his property, without the necessity of drawing a will for that purpose, by means of checks which should take effect in case of plaintiff's death, and which might be destroyed in the event of his recovery. Accordingly three checks were drawn, each bearing date April 4, 1900,—one for $1,000, payable to the defendant Henry D. Joyce; one for $500, payable to the order of Mrs. Hobern; and another payable to Mrs. Laughlin, the amount being left blank, it being the intention, apparently, that she should have the balance remaining, whatever the amount, after the other two checks were paid. These checks were signed by the plaintiff, and were put by Father Rengel in a pocketbook which was placed in a satchel which hung at the foot of plaintiff's bed. Up to this point there is substantially no contradiction in the evidence. Only the plaintiff and Father Rengel were present during the transaction, and the testimony of both is to the effect that the plaintiff believed he was going to die; that the checks were made as a means of disposing of his property in case he died, and were not to be used or have any validity in case he recovered. There is a controversy between Father Rengel and the plaintiff as to some of the details. The plaintiff stated that Father Rengel brought the checks with him. Father Rengel testified that he found them in the satchel. The plaintiff stated that these were the only checks which were signed by him. Father Rengel testified that he first drew, and the plaintiff signed, one check for $1,000, payable to his son, one for $1,000, payable to Mrs. Hobern, and one signed in blank to Mrs. Laughlin, and that upon a day subsequent the three checks above referred to were made out and signed. Father Rengel also testified that upon one of the occasions a short will was made out, devising the vacant lots referred to to Mrs. Laughlin. This the plaintiff denied, and stated that no will was made or executed by him; but it is considered that these details are of no importance, because the fact remains that concededly it was the understanding on the

part of the plaintiff that the checks as finally drawn and signed were only to have validity and force in case the plaintiff died. In case of his recovery he should be free to destroy them, and that no delivery of them should be made until after his death. It appears that, immediately after such checks had been drawn by father Rengel, he informed the plaintiff's son of the fact that they had been drawn and signed, and that they were in the plaintiff's satchel. Why he did so does not appear. Certainly there is no evidence indicating that he was instructed by the plaintiff to give such information. A few days after this occurrence the son called at the hospital, accompanied by a notary public, with deeds prepared which, when signed, would convey the vacant lots owned by the plaintiff to the defendant, and asked the plaintiff to sign them. The plaintiff, as testified to by him (and it is not contradicted), was raised up in his bed by his son, a pen placed in his hand, and he executed the deeds and acknowledged them before the notary public, and thus the lots and all the real estate owned by the plaintiff were transferred to the son. That transaction is not in question here, and it is only referred to for the purpose of showing that, apparently without any previous conversation in relation to such transfer, the conveyances were willingly executed by the plaintiff upon the simple request of the son, and because of the circumstance that a notary public was taken to the hospital by the son for the purpose of taking the acknowledgments without, so far as the evidence discloses, any knowledge on the part of the son that the father would execute such conveyances. This is deemed of some significance, especially in view of the evidence of Father Rengel, which, if true, proves that only a few days before the plaintiff had by will devised the same lots to his daughter, Mrs. Laughlin. The son, Henry D. Joyce, and the daughter, Mrs. Laughlin, testified that, a short time after the deeds above referred to had been executed,—the length of time does not appear,—they went to the hospital to see their father, and were informed by an attendant that the nurse was engaged with him, and that they could not see him at once; that they waited in the reception room for a short time, and were finally shown into the room of the plaintiff, where they were alone with him. They both testified, in substance, that the plaintiff at that time told the son that the check for $1,000 had been made in his favor, and to get it out of the pocket book in his satchel, which the son did, handed it to the plaintiff, and that the plaintiff handed it back to the son, saying, in substance: "Take the money. Buy a house with it. Take care of it. Use it to good advantage," etc.,—in substance, that the father then and there made actual delivery of the check to the son, and that when he had done so he had a fit of crying, turned his back upon the two children, and they were so overcome with grief that they had to leave the room; the son making sure, however, to take the check with him. Soon after it occurred to the son that the money could not be drawn out of the savings bank without the bank book, and he returned to the bedside of

his father, reminded him of the fact, and he then also presented him with the bank book. The plaintiff absolutely denied that any such transaction ever took place. He stated that he did not know that the check made out to his son had been removed from his satchel until about the time or after he left the hospital; that he found the other two checks, made to each of his daughters, respectively, there, and that he destroyed them; that when he had sufficiently recovered from his illness he went to his son's house, and was informed that the son had obtained the money upon the check and applied it in payment for the house and lot in question. The plaintiff testified that he in no manner authorized such payment or such use of the clerk,—in short, that the check was never delivered to the defendant by him, or with his knowledge or consent; that it was his intention, as he was informed by Father Rengel was his right, to destroy such check in case he recovered. The defendant's wife testified that previous to the time when the plaintiff went to the hospital he said to her that he intended to give her husband $1,000, and that he urged them to buy the house in question, promising that, if they did, such $1,000 would be paid to them by him. The daughter, Mrs. Laughlin, testified that her father had expressed to her the intention to help the son to purchase a home. The plaintiff in substance denied all such conversations, and insisted that, while he intended his son should have $1,000 and his two daughters the balance of his property at his death, he did not intend that such disposition should be made until that time. The plaintiff, while at the hospital, paid the charges there out of his pension money. It was not quite sufficient for the purpose, and he owed his son $20, or thereabouts, for that expense, paid by the son; but, according to the testimony of both, the father promised to repay the same. After the plaintiff left the hospital and went to the house of his son, he again commenced paying for his board, and was under the necessity, as he thought, at least, of so doing. His situation then was that he only had his pension money and the income on $1,000 with which to support himself, and was in poor health, and required constant medical attention. As is frequently the case with old people in such circumstances, the plaintiff found that his treatment in the home of the son was unsatisfactory. A quarrel ensued between him and the son's wife, with the result that they did not speak, or, at least, the plaintiff did not speak to her. This continued for a short time, when the plaintiff, whether for sufficient reason or not is not important, felt that he could not longer continue to make his home with the defendant, and left to obtain a home elsewhere. He demanded that the house and lot purchased by the son with the $1,000 be conveyed to him, charged the son with fraud in procuring the $1,000, and declared that he had never delivered the check to him. The defendant refused to comply with the demand made by the plaintiff, and this action was brought.

It will be seen that upon the only important or material question involved, to wit, whether or not the check for $1,000 was delivered by the plaintiff to the son with the intent that the title should immediately vest in him, the affirmative of the proposition is supported by the positive testimony of the son and daughter, and is denied by the father with equal positiveness, and they are the only witnesses to the transaction. The father and son are both interested in the result of the litigation. The daughter, so far as appears, is not. Therefore, if regard is had only to the number of witnesses and to the words of their testimony, and no heed is given to the circumstances surrounding the transaction, the defendant has established his defense, and has sustained the burden which was upon him of establishing the gift by sufficient, clear, and satisfactory evidence. What are the important circumstances which should receive consideration? The plaintiff was nearly 70 years of age; was very sick; was feeble; thought he was going to die within a short time; his physicians were of that opinion, and so informed the priest, relatives, and friends. The last sacrament of the church had been administered. The last act had been done to prepare the plaintiff for death. Then and under those circumstances the check in question was made, upon the suggestion of the priest, and concededly there was no thought or intention at that time on the part of the plaintiff that it should then become the property of the son. It was expressly said that, if he recovered, he reserved the right to destroy the check. At the time it is claimed this intention on the part of the plaintiff was changed, and the check was delivered to the son, concededly the enfeebled condition was still present. The plaintiff was nervous, and presumably was still under the impression that he was soon to die; at least, nothing had occurred up to that time to justify any other expectation. He was so weak or nervous that he had a fit of weeping immediately upon the close of the transaction, as claimed by the defendant. Only a day or two before he had signed away all his real estate simply at the request of the son, and, so far as appears, without any negotiations having taken place or any conversation having been had in respect to such conveyances. Can it be said, even if the check was delivered to the son under those circumstances, and while the plaintiff was in such feeble condition both of body and mind, that it was intended to be a gift to take effect in case of the plaintiff's recovery? According to the undisputed testimony in respect to the transfer of the real estate, it was only necessary for the son to ask for what he wanted. The transfer of the real estate was made, according to the testimony, at the mere suggestion of the son, notwithstanding a day or two before the plaintiff had willed it to his daughter, Mrs. Laughlin, according to the evidence of Father Rengel; and such transfer was made without any reference to the fact that a will had been made, and, so far as appears, without negotiation or conversation in respect to it. So far as appears, when the checks were drawn, the intention of the plaintiff was the same with respect to each of them. That there was any difference is not suggested by a single witness in the case, and it is an important circum-

stance that with reference to the two checks the intention of the plaintiff was precisely as testified to by him, and that upon recovering from his illness they were destroyed. He found the two checks where he had directed Father Rengel to place them, and did with them precisely as he told Father Rengel he would, to wit, destroyed them upon recovery from his serious illness. The plaintiff testified that was his intention with reference to the check in question, but that, when he went to his satchel to find and destroy it with the other two, he found it had been removed,—removed, as he states, without his knowledge or consent. The relations which these parties sustained to each other should have great weight in ascertaining what the intent of the plaintiff was, even if it should be concluded that the check was handed by him to the son. The son was strong, vigorous in mind and body, and had sustained friendly and confidential relations with his father. The only home of the father was with the son. The father was sick. Death was imminent. His will was gone, or greatly enfeebled. Again, if the contention of the defendant is to prevail, it must be concluded that the plaintiff deliberately intended to make himself substantially a pauper, and dependent upon the charity of his son or the other members of his family, which is, to say the least, unnatural, and therefore challenges our belief. The income from the savings of a lifetime was no more than sufficient to provide for the plaintiff's support and comfort while he should live; and while it is undoubtedly true that he intended that his children should have what remained at his death, in the proportion indicated by the checks which were drawn, it by no means follows that he intended to devest himself of a substantial portion of his property while he lived. Considering all the circumstances, we are irresistibly led to the conclusion that it ought not to be found, upon the evidence, that the plaintiff intended to so distribute his property, or any portion of it, at the time in question. The three checks were substantially the same as money. If, instead of the check, $1,000 in bills belonging to the plaintiff had been in his satchel, would the statement of the son and daughter be regarded as sufficient to transfer such money to the son, against the positive testimony of the plaintiff, under the circumstances disclosed in this case? It is to protect the property rights of persons situate as the plaintiff in this case was that the stringent rules have been laid down by the courts with reference to the character of evidence which is necessary to establish a gift alleged to have been made under circumstances similar to those disclosed by the evidence in this case. In Farian v. Wiegel, 76 Hun, 462, 28 N. Y. Supp. 95, the court said: "Where one claims title to property by a gift, he must establish it by evidence which is clear, convincing, strong, and satisfactory." In the case of Dinley v. McCullagh, 92 Hun, 455, 36 N. Y. Supp. 1007, it was said: "Mere possession of a book, or book and check, is but one of several elements which are essential to the establishment of the plaintiff's contention. There must have existed an intention upon the part of the intestate to part absolutely with her property, and such intention must have been consummated by an actual delivery to the donee." In Re Rogers, 10 App. Div. 593, 42 N. Y. Supp. 133, the headnote is as follows, and would seem to be especially applicable to the facts of the case at bar: "Where a person alleges that a gift was made, he must establish that fact by satisfactory proof; and where it appears that the parties were not upon even terms, as respects age, intelligence, and capacity, evidence which tends to defeat the right of the weaker party should be scrutinized with care. Among the essentials of a valid gift inter vivos are competency, intention, and freedom of the will. When a transaction between an old, feeble, and ignorant mother, of uncertain capacity, and her daughter, comparatively young, in good health and of superior understanding, claimed by the latter to constitute a gift, will not be sustained as such." The transaction referred to is strikingly similar to the one alleged by the defendant. Clear and satisfactory proof was held to be essential in De Puy v. Stevens, 37 App. Div. 289, 55 N. Y. Supp. 810. In Case v. Case, 49 Hun, 83, at page 87, 1 N. Y. Supp. 716, it was said: "In cases where confidential relations exist between the parties, the person obtaining the gift must show by the clearest evidence that the gift was freely and deliberately made. The burden is upon the person taking the gift to show that the transaction was fair and honest." In that case, in reciting the facts, the court said: "At the time the deed was executed and delivered the donee of this gift occupied a close confidential relation towards the plaintiff, who is his sister, and the transaction embraced her entire estate, so that at the age of 60 and upwards she is left penniless." That circumstance was regarded by the court as important in impelling it to the conclusion that the proof was not sufficient to sustain the gift which was the subject of that litigation. We think the proof in the case at bar, when its probative force is measured by the rules laid down in an unbroken line of authorities,—to wit, that it must be clear, satisfactory, and convincing,—falls far short of establishing the validity of the gift set up as a defense to the plaintiff's cause of action, and that the conclusion reached by the learned trial justice is not supported by the evidence. It follows that the judgment appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide event.